## LUCCHESE et al. v. MAUERMANN.

### No. 11612.

Court of Civil Appeals of Texas. San Antonio.

April 10, 1946.

Rehearing Denied May 8, 1946.

Stahl & Sohn, of San Antonio, for appellants.

Johnson & Rogers, T. D. Cobbs, Jr., and Nat L. Hardy, all of San Antonio, for appellee.

PER CURIAM.

This suit was instituted by G. J. Lucchese, H. H. Theis and E. H. Maddox, as contestants, against Gus B. Mauermann, as contestee, to contest an election held in, by and for the City of San Antonio, on September 25, 1945, upon the separate propositions to borrow money on the credit of the City of San Antonio, and to issue bonds of the City in the amount of $5,700,-000, and to levy taxes for the payment of the interest and provide and create a sinking fund for the redemption of such bonds at maturity, for the Interregional Highways bond issue, the Airport Administration Building bond issue, the Streets and Bridges bond issue, the Garbage Disposal bond issue and the Fire Stations bond issue. According to the canvassing board, the result of the election was as follows:

| "Propositions | For | Against | Majority |
| --- | --- | --- | --- |
| Interregional Highways | 6085 | 5207 | 878 |
| Airport Administration Building | 5771 | 5432 | 339 |
| Streets and Bridges | 5583 | 5553 | 30 |
| Garbage Disposal | 5935 | 5252 | 683 |
| Fire Stations | 5628 | 5500 | 128" |

There were seventeen other propositions voted upon at the same election, but all

were defeated and are not involved in this contest.

The trial was to the court and resulted in judgment for contestee. Findings of fact and conclusions of law were made and filed. Contestants have prosecuted this appeal.

■ Appellants' first eight points complain that voters living in territories known as Olmos Park and Terrell Hills were not permitted to vote, there being enough qualified voters living in these territories to have changed the result of the election. Prior to July 26, 1945, the towns of Olmos Park and Terrell Hills purported to be regularly incorporated towns. On that date the City of San Antonio, by ordinance, attempted to annex the area composing these two towns to the City of San Antonio. Suits were filed contesting the right of the City of San Antonio to annex such areas to the City of San Antonio. These suits resulted in judgments enjoining the City of San Antonio from asserting authority over this area. Appeals were taken by the City in each case to this Court, where, upon agreed motions of the parties, the judgments were amended so as to expressly decree the attempted ordinances of annexation null and void and as thus amended the judgments were affirmed by this Court. As there is now upon the minutes of this Court a judgment decreeing the ordinances which attempted to annex the Cities of Olmos Park and Terrell Hills to be null and void, we hold that the voters residing in such territory were properly not permitted to vote in a bond issue election in the City of San Antonio. City of San Antonio v. State ex rel. Town of Olmos Park, Tex.Civ.App., 195 S.W.2d 421; City of San Antonio v. State ex rel. Town of Terrell Hills, Tex.Civ.App., 195 S.W.2d 421.

Appellants' points Nos. Nine to Seventeen, inclusive, raise the contention that the trial court erred in concluding that Proposition C–45 (Street and Bridge Bonds, in the sum of $2,000,000) had been carried at the election by a majority vote.

It appears that the officials in twenty-two of the election precincts in the City delivered their returns to the City Clerk the night of the election, but thereafter one or more of the persons who had served as election officials for each of these precincts appeared at the City Clerk's office, or before the Canvassing Board, and made certain changes in the election returns. The returns as thus altered were accepted as correct by the Mayor and City Commissioners, sitting as a Canvassing Board, and said board declared that Proposition C–45 had been carried by a vote of 5583 for, and 5553 against said proposition.

By these changes in the election returns 38 additional votes were accounted for. Of these 38 votes, 34 were added to the vote in favor of Proposition C–45, and 4 were added to the vote against said proposition. Without these votes accounted for by the alterations, the vote as disclosed by the original returns would be 5549 votes for Proposition C–45 and 5549 votes against the proposition—a tie vote.

It appears that voting machines were used to register the votes cast upon the day of election, but that paper ballots were used for absentee voting. After the election a petition was filed, in accordance with the provisions of Article 2997a, Section 19, Vernon's Ann.Civ.Stats., and a recheck and comparison of the results shown on the official returns made, with the results appearing and registered on the counter dials of each voting machine used in the election. This recheck was made in the presence of a District Judge and a County Judge, as provided for by law.

The minutes of the Canvassing Board relating to this recheck and events subsequent thereto are as follows:

" * * * After the recheck of each machine, and before moving on to the next machine, the County Judge and District Judge signed a certificate written on the back of the Official Return for the precinct in which the machine in question was used. In the certificate, the Judges certified as to the correctness or incorrectness of the returns as compared with the voting machine counter dials. In making the recheck and comparison, it was discovered by the Canvassing Board that certain precinct election officers had failed to enter the result of the absentee votes on the Official Returns. Where it appeared that the absentee votes had not been in-

cluded in the totals shown on the Official Returns, the certificate signed by the District Judge and County Judge stated that fact.

"The recheck and comparison of all voting machines used in the September 25th Election was completed at 12:00 o'clock, Noon, Saturday, September 29, 1945. * * *

"On Monday, October 1, 1945, the Canvassing Board summoned the Presiding Judges of those precincts in which it appeared to the Canvassing Board, from the recheck of the voting machine counter dials, that the absentee votes had not been included in the totals shown on the Official Returns. The Canvassing Board then and there directed such election officials who had failed to enter the absentee votes upon the Official Returns to amend the Returns and enter correctly the result of the tally of the absentee votes upon the Official Returns, and to endorse on the Official Returns a notation of such action. This procedure was continued through Monday and part of the morning of Tuesday, October 2, 1945; all of which occurred before the final canvass was made by the Canvassing Board. * * *

"After the recheck and comparison of the counter dials of the voting machines had been completed, and after the entry of the necessary corrections by the election officers, the Canvassing Board met in the Council Chamber of the City Hall at 10:00 o'clock A. M., on Tuesday, October 2, 1945, to make the official canvass of the Returns of the City Special Bond Election held on Tuesday, September 25, 1945, and to declare the result thereof.

"Present and sitting as the Canvassing Board were: Mayor Mauermann, Chairman, and Commissioners Callaghan, Hein, Steffler and Anderson.

"Present also were District Judge Quin and County Judge Anderson, who reported that the recheck and comparison of the voting machine counter dials with the Official Returns had been completed and certified to be correct.

"Elmer Ware Stahl and A. R. Sohn, attorneys representing the petitioners who had requested the recheck and comparison

of the voting machine counter dials, appeared and challenged the certificate which had been written on the back of each Official Return and signed by the County Judge and District Judge during the recheck, objecting to the inclusion in the certificate of the phrase: 'Absentee votes not shown in totals.'

"Following a discussion, Judge Quin stated: 'It is my opinion that the County Judge and I certify to the correctness or incorrectness of the counter dials and have no authority beyond that.'

"Thereupon, the phrase 'Absentee votes not shown in totals,' was stricken by drawing a red line through the phrase, from the certificates in which it appeared, by Judges Quin and Anderson, but otherwise no change was made in the certificate."

Upon the trial of the case, the appellants offered the original election returns in their unaltered form which they contend show that the election resulted in a tie vote. Appellee offered the returns as altered or corrected for "all purposes." These were the returns accepted by the Canvassing Board.

 Upon the point of evidence involved we are inclined to agree with appellants. The original returns seem to have been duly certified in accordance with applicable statutory provisions. They are not self-contradictory or erroneous on their face. Consequently, the original returns are admissible as "official statements" under a well recognized exception to the rule against hearsay evidence. 16 Tex.Jur. 182, § 142; 18 Am.Jur. 345, § 251. We have not been cited to a statutory provision which authorizes persons who have acted as election judges to alter or change their official report after the election is over. Article 2997a, Section 19, above referred to, does not authorize an alteration of the returns in the manner and for the purposes disclosed here, that is, to show the results of absentee votes not theretofore accounted for.

 As we view it, the question of whether or not the persons who made the alterations in the original returns were prompted by unworthy or fraudulent motives is beside the point. In this case no

charges of fraud were leveled against those who made alterations in the election returns. The question is one of authority. If, in making changes in the returns, the persons so doing were acting officially in pursuance of lawful authority, their certificates of alteration and the alterations of the returns themselves would come within the exception to the hearsay rule as official acts or statements. Contrariwise, if the alterations and endorsements relating thereto were not made in accordance with lawful authority, such statements come within the bar of the hearsay rule.

■ We think the rule stated in Corpus Juris Secundum is applicable to the situation here: "In the absence of any valid statutory limitation to the contrary, where election officers have completed the count, executed and delivered their returns, their powers and duties are at an end; they are without power to withdraw the returns, add to, change, or alter them, or to make a new return. * * *" 29 C.J.S., Elections, § 233, p. 335.

■ However, should the original election returns in their unaltered form be accepted as the "starting point" of the judicial inquiry which has for its ultimate purpose the determination of the true results of the election, it is well settled that election returns are only prima facie evidence of the result of an election. 16 Tex. Jur. 182, § 142. In our opinion, the record of this case includes competent evidence which supports a conclusion that Proposition C-45 was carried by a majority vote. In arriving at this holding, it is unnecessary to rely upon the endorsements made upon the original returns or the alterations made therein by those who had acted as precinct election officials.

We take, for example, the returns and other evidence relating to Voting Precinct No. 37. The certificate of the election returns for this precinct shows that voting machine No. 37607 was used. Before the voting commenced, the number registered on the protective counter of the machine was 004662. All counter dials were set at zero. After the polls were closed, the number registered on the protective counter was 004697. The public counter number was 35. The election officials certified that 35 votes were cast upon the machine while two absentee votes were cast, making a grand total of 37 votes. On proposition C-45 the original returns showed that 17 votes had been cast for and 15 votes against the proposition.

As a result of a recheck of the counter dials in accordance with the provisions of Article 2997, § 19, Vernon's Ann.Civ.Stats., it was determined, in a procedure provided by statute, that the machine showed 17 votes for and 15 votes against proposition C-45. The witness Sam Bennett was present when this recheck was made. He had a schedule or tabulation showing the vote in the various precincts in the city, according to an announcement made prior to the time of the recheck. He testified that he compared this recheck with the counter dials of the various machines examined during the recheck in the presence of the district judge, and the county judge, and corrected his tabulation accordingly. This schedule was introduced in evidence and it discloses that the counter dials upon the machine registered 17 votes for and 15 votes against Proposition C-45.

This evidence shows that as the numbers on the counter dials were the same as those in the original returns and only 35 votes were cast upon the machine, the two absentee votes were not included in the return.

The trial court examined the absentee ballots cast in election precinct No. 37 and found that the two absentee ballots had been cast in favor of all propositions (including C-45) submitted at the election. Consequently, the evidence shows that the true vote in Election Precinct No. 37 was 19 votes for and 15 votes against Proposition C-45.

It is apparent that if the original returns of all other voting precincts in the City, other than Precinct No. 37, be accepted as correct and the true result of the vote in Precinct No. 37 added thereto, the result as to Proposition C-45 is 5551 votes for and 5549 votes against—a majority vote in favor of the proposition.

It appears that the evidence relating to the vote in Precincts Nos. 27, 30, 71, 79,

94, 105, 115 and 116 is similar to that relating to Precinct No. 37. The absentee ballots in these precincts, which were not accounted for in the original election returns, were inspected by the trial judge and it was determined that 11 absentee voters had cast their ballots in favor of Proposition C–45, while one had cast his ballot against said proposition. The totals therefore would be 5562 for and 5550 against Proposition C–45.

We hold that Proposition C–45 was carried by a majority vote and overrule appellants' points Nos. 9 to 17, inclusive.

Appellants next contend that the trial court erred in not finding that 34 persons whose names were listed in Exhibit F, were disqualified as electors in this election. We overrule this contention. Art. 6, Sec. 3a of our State Constitution, Vernon's Ann.St.Const., provides, in effect, that when an election is held in a City for the purpose of issuing bonds or otherwise lending credit, or expending money or assuming any debt, only qualified electors who own taxable property in the City and who have duly rendered the same for taxation shall be qualified to vote. The record shows that these voters were permitted to vote by the election judges and therefore their votes are presumed to be legal and the burden is upon appellants to show that they are illegal votes. 16 Tex.Jur., § 145, p. 190; Pippin v. Holland, Tex.Civ. App., 146 S.W.2d 266; Neil v. Pile, Tex. Civ.App., 75 S.W.2d 899; Willow Hole Independent School District v. Smith, Tex. Civ.App., 123 S.W.2d 708.

Appellants attempted to show that these voters were disqualified to vote because their names did not appear upon a list prepared by Tax Commissioner Alfred Callaghan purporting to show the names of persons who own taxable property in the City of San Antonio and which property had been duly rendered for taxation for the year 1945. Commissioner Callaghan testified in effect that this list was complete as to voters who owned real estate but incomplete as to voters who owned personal property only. There is no provision of the statute which authorizes or requires the tax commissioner to make up a complete list of voters who own taxable property and who have duly rendered the same for the purpose of taxation. Therefore, the list furnished by Commissioner Callaghan cannot be regarded as a list required by law.

It seems that Commissioner Callaghan, in making up the list introduced in evidence as appellants' Exhibit 13, was attempting to comply with the provisions of Art. 2955b, Vernon's Ann.Civ.Stats. This article reads as follows: "Whenever an election is called in the State of Texas or any political subdivision thereof or in any defined district for the purpose of authorizing the issuance of bonds which place a lien upon real estate, it shall be the duty of the Tax Collector of the county or political subdivision or defined district to furnish to the Election Judges a certified list of the owners of real estate in said county or political subdivision of the State in which said election is to be held who have rendered the same for taxes as shown on the tax rolls; said list of real estate owners shall determine the qualification of the electors to participate in said election."

Thus it will be seen that this article only requires a list of owners of real estate who have rendered their property for taxation but does not require nor permit the listing of voters who are the owners of personal property who have duly rendered the same for taxes. The Constitution, Art. 6, Sec. 3a, provides, in effect, that both classes of property owners are entitled to vote in a bond election. A list prepared under the provisions of said Art. 2955b could serve no useful purpose in the conducting of a bond election, as it would show on its face to be only a partial list of persons entitled to vote. The fact that a voter's name did not appear upon such a list would create no presumption whatever that such a voter was not qualified to vote. Furthermore, property is often rendered in assumed names, partnership names, trade names, and sometimes in the name of the husband, though it is owned by the community estate of himself and his wife.

The burden of proof was upon appellants to show that the persons whose names were listed in Exhibit F were illegal voters, and they failed to discharge that burden. The trial court properly held that the evidence

did not show these voters to be illegal voters.

What we have said above applies with equal force to the list of voters appearing in appellants' "Exhibit G."

 Appellants next contend that the trial court erred in holding that Section 52 or Article 3 of the Constitution of Texas had no application to the issuance of bonds for Interregional Highways, and that said proposition did not have to receive a two-thirds majority vote before it could be declared carried. We overrule this contention.

The purpose for which these bonds were to be issued must be determined by the ordinance calling the election, which reads as follows:

"A–45: Interregional Highway Bonds, $1,750,000.00

"2. Shall the Board of Commissioners of City of San Antonio be authorized to borrow money on the credit of said City, and to issue bonds of the City for permanent public improvements, to acquire property for the right-of-way for the Interregional Highway and Freeway and access ways thereto to establish and open streets or boulevards, and the appurtenances thereof, to improve traffic conditions and promote public safety in the City in the amount of $1,750,000.00, * * *."

It is apparent that the bonds were being issued, among other purposes, for the purchase of the right-of-way for interregional highways which pass through the City of San Antonio. It appears that a tentative understanding exists between the City and the State Highway Department that the right-of-way should be purchased by the City and that the State with Federal aid would build the through highways and maintain them. There was no intimation that the City contemplated buying any right-of-way except for highways within the city limits. The fact that the highways were to be built and maintained through the City with State and Federal funds, and the further fact that when completed such roads would constitute an integral part of the State and National Highway System, would not prevent such roads from at the same time being city streets in the City of San Antonio. City of Wichita v. Bowen, 143 Tex. 45, 182 S.W. 2d 695, 154 A.L.R. 1434.

The trial court properly held that Section 52 of Art. 3 of the Texas Constitution has no application to Proposition A–45, known as the Interregional Highway Bonds. A careful reading of this section will reveal that the first part of the provision relating to lending credit or granting public money or other thing of value to any individual, association or corporation or becoming a stockholder in the same, applies to cities and towns, but the second part requiring a majority vote of two-thirds to authorize the issuing of bonds for the purpose of "The construction, maintenance and operation of macadamized, graveled or paved roads and turnpikes, or in aid thereof," does not apply to cities. This part of the section is not expressly made to apply to cities and towns, nor does it do so by necessary implication.

The only restriction in the Constitution against home rule cities, such as San Antonio, creating debts other than as above stated is to be found in Sec. 5, Art. 11, which states: "No debt shall ever be created by any city, unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and creating a sinking fund of at least two per cent. thereon." Our statute, Art. 1175, Subdivision 10, Vernon's Ann.Civ.Stats., provides, in effect, that home rule cities may issue bonds for the purpose of making permanent public improvements when authorized by a majority of the duly qualified property tax-paying voters voting at an election held for that purpose. The City Charter of the City of San Antonio, Section 53, Art. II, provides for the issuing of bonds for permanent public improvements in keeping with the authority granted in said Art. 1175.

We therefore conclude that proposition A–45, known as the Interregional Highway Bonds, only required a majority vote of the duly qualified property tax-paying voters who had duly rendered their property and who voted at the election, and a two-thirds majority was not required.

The judgment will be in all things affirmed.